UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| H.H. DISTRIBUTIONS, L.P., | : | Bankruptcy No. 08-10700DWS |
| Debtor. | : | |
| In re | : | Chapter 11 |
| HILLEN REAL ESTATE ASSOCIATES, L.P., | : | Bankruptcy No. 08-10701DWS |
| Debtor. | : | |
| In re | : | Chapter 11 |
| H.H. FLUORESCENT PARTS, INC., | : | Bankruptcy No. 08-10707DWS |
| Debtor. | : | |
| In re | : | Chapter 11 |
| H.H. DISTRIBUTIONS MANAGEMENT, LLC, | : | Bankruptcy No. 08-12217DWS |
| Debtor. | : | |
| In re | : | Chapter 11 |
| HILLEN MANAGEMENT GROUP, INC., | : | Bankruptcy No. 08-12219DWS |
| Debtor. | : | |

# MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, United States Bankruptcy Judge**

Before the Court are requests to confirm the (1) Consolidated First Amended Plan of Reorganization dated October 23, 2008 ("Distributions Plan") of H.H. Distributions, L.P. ("Distributions"), H.H. Fluorescent Parts, Inc. ("Parts") and H.H. Distribution Management,

LLC ("HH Management") and (2) Consolidated Second Amended Plan of Reorganization dated October 23, 2008 ("RE Plan") of Hillen Real Estate Associates, L.P. ("Hillen RE") and Hillen Management Group, Inc. ("Hillen Management"). Objections to both Plans have been filed by the United States trustee ("UST") and Local Union 1158 IBEW Pension Fund-PA (the "Fund").[1] Moreover, as the Fund controls the class of unsecured creditors and rejected both Plans, confirmation was sought pursuant to 11 U.S.C. § 1129(b). An evidentiary hearing was held on December 1 and 3, 2008. For the following reasons, confirmation of the Distributions Plan and the RE Plan is denied.

**BACKGROUND**

A. <u>The Debtors</u>

In 1995 Robert J. Hillen Sr. ("RJS Sr."), his wife Kathleen D. Hillen ("Kathleen") and his son Robert J. Hillen Jr. ("RJH Jr.") (RJS Sr., Kathleen and RJH Jr. together are the "Hillens") became the owners of Parts, a company RJH Sr. had worked for since 1962 and in which he acquired a part ownership in 1990. Parts had two lines of business: it was a manufacturer of fluorescent light fixtures and it was a distributor of parts purchased from overseas and sold to other lighting manufacturers. Parts was formed as a corporation with the three family members holding equal shares.

---

[1] Contemporaneously with its Objection, the Fund filed a cross motion to convert or dismiss the Chapter 11 cases. The motions were scheduled by the Fund's counsel to be heard on the same day as confirmation but without proper notice. I accordingly declined to hear them. By Order dated December 17, 2008, the motions were dismissed as being without proper notice and as being premature, the Court's rulings on confirmation being a predicate to their consideration. Doc. No. 154.

In early 2004 the Hillens recognized that their manufacturing enterprise could not operate profitably due to increased labor costs and benefits. They formed Distributions, a limited partnership, to continue the parts distribution component of Parts' business. The interests in Distribution are held by RJH Sr. (49%), Kathleen (50%) as limited partners and HH Management as corporate general partner (1%). It does not appear that HH Management has any assets other than its 1% interest in Distributions nor any present function. Its only liability is the claim of the Fund described below. In 2005, after the formation of Distributions, RJH Sr. and Kathleen relinquished their interest in Parts to their son who is presently the sole stockholder of this entity.[2]

While there was some overlap in the life of Parts and Distributions as the manufacturing operations were wound down and the distribution functions transferred, Parts has not operated since December 2005. The former employees and offices of Parts now belong to Distributions. Distributions' operations are financed by a line of credit issued by T.D. Bank-North (formerly Commerce Bank) ("Bank") which has a claim from this loan of $340,584 secured by all Distributions' assets and the Hillens' guarantees. During the course of this bankruptcy, in consideration of Bank's agreement to allow use of

---

[2] Neither RJH Sr. or RJH Jr. in their testimony appeared to have an understanding of the legal structure of their five entities other than that they were formed upon the advice of their accountants. RJH Sr. noted that Parts was transferred to RJH Jr. to keep its ownership separate from Distributions which he and Kathleen were to own. It appears from this and other legal and accounting steps, that the Hillens' professionals were making a case to avoid piercing of the corporate veil, a claim which was subsequently brought by the Fund and rejected in the District Court Action described below. Exhibit D-2.

cash collateral and provide post-petition, Debtor agreed to pay a financing fee. Doc. No. 48. According to RJH Jr., it has not drawn on the line of credit because it did not need additional funds to buy inventory.

In connection with the restructuring of the business, Parts transferred its inventory to Distributions, and the resulting intercompany inventory receivable in the amount of $633,705 is Parts' only asset. Exhibit D-8. Significantly when Parts ceased operations, it withdrew from the Fund. As a consequence, a withdrawal liability in the amount of $826,221 was imposed. Exhibit D-2, <u>Local Union 1158 I.B.E.W. Pension Fund-PA v. H.H. Fluorescent Parts, Inc</u>, 2008 WL 2679169 (E.D. Pa. June 30, 2008) ("District Court Opinion"), at *4.[3] The Fund offered a payout of this claim but Debtors did not accept and made no payment. When the Fund called the resulting default, the Debtors filed for Chapter 11 protection. It is undisputed that the pension withdrawal liability is the cause for filing these bankruptcy cases.[4]

---

[3] The Fund had commenced the action in the United States District Court for the Eastern District of Pennsylvania ("Distict Court Action") against the Debtors as well as the Hillens. As the bankruptcy petitions stayed actions against Distributions, Parts and Hillen RE, the Court entered summary judgment against the two management companies (which did not file petition until April 2008) and went forward with a bench trial against the Hillens. The District Court Findings are memorialized in a 15-page opinion which ultimately concluded that the Hillens would not be liable to the Fund on an alter ego theory. Exhibit D-2, 2008 WL 2679169 at *6.

[4] As part of its Objection, the Fund complains that the use of bankruptcy solely to avoid payment of the Fund is evidence of bad faith. I disagree. Bankruptcy is an appropriate tool for dealing with obligations that are beyond a firm's ability to presently pay. What may be bad faith is an attempt to use bankruptcy to avoid payment <u>and</u> fail to propose a plan that is fair and equitable to that creditor. The Hillens believe that because they paid all the pension obligations of their employees, the withdrawal claim is unfair (although legal) and their *de mimimus* commitment

(continued...)

The Fund has filed proofs of claim against Parts ($1,317,964.11), Distribution ($1,258,424.98) and HH Management ($1,317,964.11) and thus represents the bulk of the unsecured claims against these entities.[5] They represent 91%, 98% and 100% of the unsecured claims in amount in each case, respectively. The Fund also filed proofs of claim against Hillen RE ($1,258,424.98) and Hillen Management ($1,317,964.11). They represent 92% and 100% of the unsecured claims in these two cases, respectively.

After the Hillens acquired Parts, they formed Hillen RE as a limited partnership to hold the real estate and building at 104 Beecher Avenue, Cheltenham, PA (the "Property"). JRH Sr., Kathleen, and RJH Jr. are the limited partners of this entity, again with a separate entity, Hillen Management, formed to be general partner.[6] The Property is presently occupied by Distributions pursuant to a written lease (not produced) which pays Hillen RE $9,000 monthly rent, an amount sufficient to service the mortgage on the Property held by Bank. The Bank's mortgage loan balance is $930,000 and is guaranteed by the Hillens.

---

(...continued)
to fund it reflects that view. In so doing, they are putting at risk their and their employees' livelihood and their personal assets as a result of their guarantees which would be called if the reorganization cases were to fail. The Fund complains that they are being paid a minimal dividend (true) and are determined to defeat this reorganization although they will most likely receive nothing in a liquidation. I encouraged the parties to try to reach a compromise but am advised that discussions were unsuccessful.

[5] The statutory liability is imposed on each of the Debtors. Why the amount varies was not explained.

[6] According to the District Court Opinion, the interests are held by RJH Sr. (30%), Kathleen (33%), RJH Jr. (33%) and Hillen Management (4%) which is owned in turn by RJH Sr.. Dist Ct Opinion at *1.

In addition, Hillen RE receives $1,750 monthly from a neighboring business that rents warehouse space on a month-to-month basis. According to RJH Jr., the Property was exposed for sale by three brokers during which time they received a written offer of $750,000 and a verbal offer of $1.1 million that was conditioned on township approvals and did not materialize. Rather than accept an offer that would not pay the Bank in full, the Property was taken off the market in December 2007. According to the testimony of Paul Quinn, the real estate has a value of $900,000 as of April 2008. Exhibit D-2A.

## B. The Plans

Debtors propose a substantive consolidation of Parts, Distributions and HH Management pursuant to the Distributions Plan, and a substantive consolidation of Hillen RE and Hillen Management pursuant to the RE Plan. The material features of each are described below. The Fund and the UST have objected to the Distributions Plan as violative of the absolute priority rule of § 1129(b).[7] The Fund also objects to this Plan as infeasible contrary to § 1129(a)(11) and as containing an impermissible substantive consolidation.

Distributions Plan. There are six classes under this Plan: (I) Administrative Claims consisting of professional fees of Debtor's counsel Paul J. Winterhalter P.C. ("Winterhalter Firm") ($46,565), Debtors' accountant Fabetti, Hale & Associates ("Fabetti") ($40,000), and

---

[7] Both parties also objected to both Plans as containing exculpation and releases of third parties contrary to applicable law in this Circuit. Those provisions were orally withdrawn in open court at the beginning of the confirmation hearing.

-6-

real estate appraiser ($2,500); (II) Secured Claim of Bank ($1,297,864);[8] (III) Priority tax claims ($1,100); (IV) assumed real estate and personal property leases (none are disclosed); (V) unsecured claims ($1,768,352) and (VI) insiders and equity holders (none are disclosed).

Administrative claims are to be paid in full. The priority tax claim shall be paid in full to the extent of available cash from operations or no later than after twelve months of equal payments with interest. With respect to the Bank, the Debtor has negotiated a $450,000 line of credit (subject to available borrowing base formulas) and commitment to fund until June 2009 for which it shall pay a $5,000 commitment fee.[9] In exchange, the reorganized debtor shall pay the Bank on before the Effective Date $32,000 against its outstanding attorneys' fees and $1,750 monthly thereafter with the balance of the fees due on the June 2009 maturity date.[10] While the Plan does not so provide, the projections prepared by Fabetti in support of Plan feasibility reflect a quarterly payment to the Bank of $20,475 which he testified represented an amortized payoff of the line of credit. Why it is projected to commence in February 2009 was not stated. Obligations to the Bank shall be guaranteed

---

[8] According to an Exhibit to the Second Amended Consolidated Disclosure Statement, this includes the line of credit principal balance of $340,584, the real estate loan in the amount of $913,580, accrued interest in the amount of $1,700 and Bank counsel fees and costs of $42,000. Based on cross-collateralization provisions, a like claim is provided for in the RE Plan.

[9] The prepetition line of credit was in the amount of $600,000. Doc. No. 37 (Motion for Authorization to Obtain Post Petition Secured Financing); 48 (Stipulation and Interim Order). When Distributions' petition was filed in January 2008, the loan, which was not in default, was drawn in the amount of $340,584. According to RJH Jr., the loan had been reviewed and renewed on an annual basis. Pursuant to a series of cash collateral and post-petition financing stipulations, Bank provided Distributions debtor-in possession financing but in the reduced amount of $450,000. Id.

[10] I was advised that shortly before the confirmation hearing, Bank had been paid $10,000 of the $32,000 lump sum payment.

by the Hillens, and the loan shall be cross-defaulted and cross-collateralized with the real estate loan. Unsecured creditors are to receive a 5% dividend payable over three years. The equity interests in the Debtors shall be cancelled and new stock of the reorganized consolidated company shall be issued to the Hillens in equal shares for which they will infuse $50,000 as new value. RJH Sr., Kathleen and RJH Jr. will continue in their present positions post-confirmation for which they have been and will continue to be paid weekly compensation of $2,100, $400 and $3,000, respectively.

<u>RE Plan.</u> There are the same six classes of claims under this Plan: (I) Administrative Claims consisting of professional fees of Debtor's counsel Paul J. Winterhalter P.C. ($15,000), Debtors' accountant ($O), real estate appraiser ($2,500); (II) Secured Claim of Bank ($1,297,864);[11] (III) Priority tax claims ($1,100); (IV) assumed real estate and personal property leases (none are disclosed); (V) unsecured claims ($1,768,352) and (VI) insiders and equity holders (none are disclosed).

Administrative claims are to be paid in full. The priority tax claim shall be paid in full to the extent of available cash from operations but in no event later than twelve months of equal payments with interest. With respect to the Bank, neither the Plan, Disclosure Statement or testimony indicated what payments are to be made on account of the real estate loan. The only undertaking is the same (and therefore duplicative) agreement to satisfy the Bank's legal fees by paying the aforementioned $32,000 by confirmation with monthly payments of $1,750 thereafter. As for unsecured creditors, the dividend is 1% of

---

[11] <u>See</u> note 8 <u>supra</u>.

the allowed claim paid over 24 months. Equity holders will receive no distribution but the Hillens offer $20,000 to retain all the interests in the reorganized real estate company.

**DISCUSSION**

In order to be confirmed, a plan must comply with all the requirements of § 1129(a). 11 U.S.C. § 1129(a). In re Adkisson Village Apartments of Bradley County, Ltd., 133 B.R. 923, 925 (Bankr. S.D. Ohio 1991). Thus, even absent an objection, the plan proponent has the burden of showing, and the bankruptcy court has the duty to ensure, that the requirements of § 1129(a) are met. In re Haskell Dawes, 199 B.R. 867 (Bankr. E.D. Pa. 2006); In re Union Meeting Partners, 165 B.R. 553, 574 (Bankr. E.D. Pa. 1994), aff'd, 52 F.3d 317 (3d Cir. 1995).

### I. Distribution Plan

#### A. Feasibility

Section 1129 (a) sets forth the mandatory requirements of a confirmable plan and requires, inter alia, that the court find that

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). The purpose behind the statutory requirement of feasibility is to "'prevent confirmation of visionary schemes which promise creditor and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'" 7 Collier on Bankruptcy, ¶ 1129.03[11], p. 1129-74.1 (15th ed. rev. 2005) (*quoting* Matter

of Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir. 1985)). See also In re Cohen & Sons Caterers, Inc., 124 B.R. 642, 647 n.8 (E.D. Pa. 1991). Feasibility does not require that substantial consummation of the plan be guaranteed; rather, the plan proponent must demonstrate that there be a reasonable assurance of compliance with plan terms. See In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985); In re Cohen, 124 B.R. at 647 n.8.

Distributions is a small family business that operates with a slight profit. The feasibility issue arises because Bank has refused to commit to finance the reorganized company past June 2009. Fabetti makes the assumption that if the Bank does not further extend the line of credit, it will not demand full payment. Instead he projects a pay back of $20,475 per quarter commencing February 2009. At this rate the loan would be repaid in about four years. Fabetti appears to have arbitrarily plugged in this amortized debt repayment number because any larger payment would put the company in a deficit cash position. As noted, it contemplates payment after the extended loan matures. Since the payment terms are not provided for in the Plan, the Bank will not be bound by this repayment schedule. Fabetti has absolutely no basis for this treatment of the Bank's claim. The Bank's counsel has made clear to the Court and parties that the Bank has made no commitments with regard to post-June financing. The correct projection based on the Bank's actual position would be to book the full amount when due in June 2009. This renders the Debtor unable to operate as a going concern.

The Bank has gone along with the Debtors in this case without any increase in its exposure. After paying a financing fee, Distribution has not drawn on the line of credit during the bankruptcy case. It appears that Bank's agreement to extend until June 2009

was in consideration of the Debtors' agreement under the Distributions Plan to repay $40,000 in legal fees, and provide a $5,000 commitment fee, cross defaults, cross collateralization and the renewal of Hillen guarantees. Distributions had already paid $10,000 toward that obligation before the confirmation hearing. The Bank has clearly negated any inference that it will provide any financial support after June 2009 or any deferral of loan repayment then due. The Debtor has not disclosed any prospects of replacement financing or even any efforts to secure same. Indeed other than its accountant's unilateral but unfounded assumption that the maturing loan can be repaid over a four year period, Distributions has simply ignored this fatal flaw in the reorganization plan. Based on this fact alone, I cannot find that the Debtor has met its burden to prove that the reorganization will not be followed by a further financial reorganization.[12]

### B. New Value and the Absolute Priority Rule

Since Debtors' Plan has not been accepted by Class IV, the Fund, it does not satisfy § 1129(a)(8) and thus may only be confirmed utilizing the "cram down" of § 1129(b) to circumvent the absolute priority rule which requires a dissenting class of creditors to be paid in full before any junior class can receive property under a plan. Norwest Bank

---

[12] At the conclusion of the confirmation hearing, I opined that the Fund's objection to this end resonated with me and I was troubled by this aspect of the Distributions Plan. Bank's counsel was present observing the proceedings. I encouraged all the affected parties: Debtors, Hillens, Fund and Bank to attempt to reach a compromise because all would be losers if these Debtors fail. See note 4 supra. I am informed that an attempt was made but the parties could not agree.

Having found that the Plan is not feasible, I cannot confirm it. With the continued hope that the Bank will recognize that a liquidation will prejudice its interests and offer financing past June 2009, I will allow Debtors another opportunity to amend their Plan. To facilitate that effort, I will address the other objections raised by the UST and Fund.

Worthington v. Ahlers, 485 U.S. 197, 202 (1988). I had occasion to express my views some time ago on the application of § 1129(b) where a debtor seeks to "cram down" a plan over the controlling dissent of its creditors by offering "new value." In re Haskell Dawes, 199 B.R. 867 (Bankr. E.D. Pa. 2006). See also In re Arc Water Treatment, 1998 WL 732875 (Bankr. E.D. Pa. Oct. 15, 1998). Not unexpectedly, the new value exception to the absolute priority rule is invoked by the Debtors herein.[13] As my views have not changed, I will refer to Haskell Dawes to set forth the legal principles that I am to apply in determining whether the new value proposed by the Hillens is legally sufficient to overcome the negative vote of Class IV.

It is well accepted that to qualify as new value, old equity will have to make a capital contribution that is (1) in the form of money or money's worth; (2) necessary to the reorganization; (3) substantial and (4) reasonably equivalent to the value of the interest being retained. Id. at 872.

1. Money or money's worth. To the extent that the Hillens have committed to contribute $50,000,[14] they are obviously providing money. They also argue that their guarantee of the Bank debt is further evidence of new value. I respectfully disagree.

---

[13] The term "exception" is somewhat of a misnomer but given its common usage, I have labeled it as such to refer to the limitation on the absolute priority rule that obtains when an equity holder seeks to retain (i.e., buy back) an equity interest in the reorganized debtor over the objection of a senior dissenting unsecured creditor class that is not being paid in full. Haskell Dawes, 199 B.R. at 871 and n. 12.

[14] It was not clear to me that the Hillens understood that this contribution would be required to be posted as a condition of confirmation. They spoke of the money being available to supplement business revenue that will fund post-confirmation obligations. This ambiguity would be addressed in the confirmation order were I to confirm this Plan.

The guarantees are not money's worth. Arc Water Treatment, 1998 WL 732875 at *3, *citing* Ahlers. Moreover, since the Hillens are already guarantors of the bank debt, this value is not even new.

    2.   Necessary to the Reorganization. Courts have held that contributions are necessary to a reorganization where (1) they will fund repairs or improvements to the debtor's property necessary to the reorganization; or (2) they are necessary to enable the debtor to make payments due under the plan and continue operating. Haskell-Dawes, 199 B.R. at 873-74. Debtors have provided no evidence as to any intended use of this money for repairs or improvements. Their accountant provided a cash flow projection which showed the reorganized company generating profits from January 2009 (which would be the Effective Date if this Plan were confirmed) to March 31, 2012 before Plan payments and without regard to obligations under the line of credit. Exhibit D-4. However, in certain months where either a UST payment and dividend to unsecured creditors are due or the presumed debt service payment and dividend to unsecured creditors are due, the reorganized entity is unprofitable. Presumably the new value could be used to fill those gaps and would be necessary as that term is understood. Yet because the debt service assumption regarding installment repayment of the Bank's line of credit is nothing more than the accountant's plugged in number, the $50,000 is not really effective to that end.

    3.   Substantial. In determining whether a contribution is substantial, I have considered the following factors: the size of the contribution; its relation to the amount of unsecured claims against the estate; its relation to the plan's distribution to unsecured creditors; its relation to a normal market contribution; and the amount of debt to be

discharged. Arc Water Treatment, 1998 WL 732875, at *5. In this case, the $50,000 contribution represents slightly less than 3% of the unsecured debt aggregating $1,768,352. As noted by the Fund, I have previously held that this level of contribution is insubstantial Haskell Dawes, 199 B.R. at 876-77) (5.1%); Arc Water Treatment, 1998 WL 732875, at *5 (3.6%). See also In re Woodbrook Associates, 19 F.3d 312, 320 (7th Cir. 1994) (3.8%); In re Snyder, 967 F.2d 1126, 1131-32 (7th Cir. 1992) (2.7%); In re Sovereign Group, 1985-27 Ltd., 142 B.R. 702, 710 (Bankr. E.D. Pa. 1992) (3.6%).

More revealing than these numerical comparisons is the arbitrariness of the proffered contribution which bears no demonstrated relation to the resources of the Hillens, the size of the dividend offered to unsecured creditors or the substantial benefit to be realized by the Hillens personally were this case to reorganize rather than liquidate. I have previously held that plan funders who wish to retain the equity of a closely held corporation must demonstrate that they have used their best efforts in fixing their contribution. Haskell-Dawes, 199 B.R. at 875-76. By their own testimony, the Hillens have not done so. Not only were they conspicuously vague about their funding capacities but they have failed to make the very compromises in their own remuneration that they willingly made when they were not protected by bankruptcy. Contrary to the pre-bankruptcy period where they withheld their own salaries to pay their debts as they came due, they have taken no reduction in salary during the Chapter 11 case nor do they contemplate doing so to fund a plan. Yet a successful reorganization will defer payment of Bank

guarantees, prevent foreclosure of the Property and importantly provide the family with an income. I cannot conclude that the $50,000 contribution is substantial.

    4. <u>Reasonably Equivalent to the Value Being Retained.</u> In order to determine whether the $50,000 contribution is reasonably equivalent to the value being retained by the Hillens, the Debtors needed to elicit evidence of the value of the reorganized entity. The generally accepted method for establishing enterprise value is the capitalization of future earnings. <u>Haskell Dawes</u>, 199 B.R. at 878. This entails an earnings projection discounted to present value on the basis of a capitalization rate that reflects the expected annual rate of return that investors would require on an investment of comparable risk. <u>Id.</u> at 878-79. Debtors failed to provide that analysis. While Fabetti prepared operating projections, he drew no conclusions about enterprise value therefrom. Based on this record, I cannot determine the value being retained by the Hillens. Thus I must conclude that the Hillens are receiving value on account of their ownership interests and as such, the Plan violates the absolute priority rule.

## C. *Substantive Consolidation*

Substantive consolidation[15] merges the assets and liabilities of the debtors into a unitary debtor estate with all the cumulative assets and liabilities (except inter-entity liabilities, which are eliminated). The result is that all claim holders must look to the

---

[15] Substantive consolidation differs from procedural consolidation, more commonly known as joint administration, in that the latter does not effect the substantive rights of creditors or their respective debtor estates but rather is a tool of administrative convenience and cost efficiency.

consolidated entity for their distribution. In re Owens Corning, 419 F.3d 195, 205 (3d Cir. 2005). Substantive consolidation is not specifically provided for in the Bankruptcy Code. Rather the court's power to order substantive consolidation is commonly found to be derived from its equitable powers contained in § 105. See, e.g., In re Augie/Restivo Baking Co. Ltd., 860 F.2d 515, 518 (2d Cir. 1988).

The courts that have considered the permissibility of substantive consolidation have articulated various tests and factors to be considered. For example, in Augie/ Restivo, 860 F.2d at 518, the Second Circuit Court of Appeals stated the test as (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit or (2) whether the affairs of the debtor are so entangled that consolidation will benefit all creditors. Other courts have identified other criteria such as (1) the use of consolidated financial statements; (2) the unity of interest of and ownership between the entities; (3) existence of parent and intercorporate loan guarantees; (4) degree of difficulty in identifying and segregating individual assets and liabilities; (5) existence of asset transfers without observance of corporate formalities; (6) commingling of assets; and (7) profitability of consolidation at a single location. In re Orfa Corp., 129 B.R. 404, 414-415 (Bankr. E.D. Pa. 1991) (citing cases). Not all these factors need to be present to order consolidation. Id.

Debtors were not explicit as to the reasons they sought substantive consolidation. Presumably they perceive some advantage in reducing the Fund's separate claims against Distributions, Parts and HH Management to one claim against the consolidated entity and eliminating the intercompany claim of Parts against Distributions for the value of transferred

inventory. In support of the application, RJH Jr. testified that as a result of Distributions continuing the business line formerly engaged in by Parts, a number of vendors are confused about the identity of their supplier and make payment to Parts. Parts appears to have moved all its assets and obligations to Distributions. Distributions' management, employees and business premises are identical to that of Parts. HH Management has never operated, has no assets and other than the Fund claim, has no liabilities. Presumably its inclusion in the consolidated enterprise is a convenient and cost saving method of terminating that entity. While these benefits are not substantial, they are benefits nonetheless. However, if the benefits of the substantive consolidation are outweighed by prejudice to an objecting creditor, the consolidation should not be permitted. Id.

In this case, the Fund has objected although for reasons that appear to be more obstructionist than real. I cannot perceive any detriment to the Fund, and the Fund's counsel was unable to identify one when queried. Merging the assets and liabilities of these three companies eliminates the intercompany debt of Distributions to Parts. Since the Fund is a creditor of both entities, it is not prejudiced. It also reduces the Fund's three claims to one. However, I fail to see how this has any economic consequence to the Fund. The size of its unsecured claim dwarfs all other unsecured claims in the aggregate. Exhibit D-8.[16] As noted, the Fund's claims represent 91% (Distributions), 98% (Parts) and 100% (HH Management) of the claim pool of the respective debtors. See page 5 supra. Management has no assets so the 100% participation offers no advantage to Fund on

---

[16] The Distributions balance sheet shows $135,406 of unsecured debt exclusive of the Fund's claim on the October 30, 2008 balance sheet.

-17-

that claim. Parts' only asset is its claim against Distributions which if eliminated by the consolidation, leaves fewer claims against Distributions, a benefit to Fund that compensates for the detriment of the loss of the asset to Parts. I find the substantive consolidation in this case innocuous and somewhat ironic given the Hillens' professionals endeavors to make the entities look separate when in effect Distributions simply carried on the profitable line of Parts' business, hoping to shed itself of the burden of Parts' labor costs, including its pension liabilities. If vendors are still confused, as RJH Jr. stated, it is because they are no different. It makes sense to match the organizational structure with reality. The Fund's objection insofar as it objects to substantive consolidation is overruled.

## II. RE Plan

While separate plans, the RE Plan is inextricably related to the Distribution Plan. As noted, the sole function of Hillen RE is to own the Property which it leases to Distributions. The rents received from Distributions are used to service the Bank's mortgage loan. Those payments cannot be made unless Distributions is a viable entity. Since I have concluded that the Distributions Plan is unconfirmable, there is no prospect that the stream of rental income will continue after June 2009.

As noted above, § 1129 (a) sets forth the mandatory requirements of a confirmable plan and requires, inter alia, that the court find that

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan.

Hillen RE has no contingency plan that will allow it to maintain current payments of

Case 08-12219-bif    Doc 77    Filed 01/16/09    Entered 01/16/09 14:03:22    Desc Main
Document    Page 19 of 19

In re H.H. Distributions, L.P. - Bankruptcy No. 08-10700DWS
Substantially Consolidated w/ 08-10701DWS; 08-10707DWS; 08-12217DWS; 08-12219DWS

Bank's mortgage loan in the event Distributions' reorganization is unsuccessful. Past efforts to sell the Property at a price that would satisfy the secured debt have been unsuccessful and were abandoned. A default under the mortgage will trigger a liquidation and doom any reorganization by the RE Debtors. On this basis alone, the RE Plan cannot be confirmed.

An Order consistent with the foregoing Memorandum Opinion shall be entered.

*[Signature: Diane W. Sigmund]*

DIANE WEISS SIGMUND
U.S. Bankruptcy Judge

Dated: January 16, 2009